### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| LINDA ROWLANDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:13-CV-00059-RLM-RBC |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff Linda Rowlands ("Rowlands), by counsel, respectfully requests this court to deny Defendant United Parcel Service, Inc's ("UPS") Motion for Summary Judgment due to genuine issues of material fact which prohibit the entry of judgment in favor of Defendant UPS as a matter of law.

## I.    INTRODUCTION

Rowlands was a 5'3" tall, 50 year-old[1] female, long-time employee of UPS who had worked her way up the ladder to a coveted job, full-time QC Clerk, which had flexible hours and a relatively high rate of pay. In April 2012, Rowlands suffered a severe injury to her knee, on-the-job, for which she asserted her rights to worker's compensation benefits. Approximately one week prior to her knee surgery, around July 19, 2012, Rowlands was terminated for alleged time card fraud. Rowlands, however, told her manager during the arbitration proceedings that the real reason for her termination was her workplace knee injury.

Because others had engaged in the same behavior for many years and the time card system

---

1 Rowlands date of birth is April 4, 1962.

permitted employees to make the type of changes made by Rowlands and others, Rowlands was reinstated and returned to her job on September 27, 2012 wearing a brace on her knee which remained until she was terminated for good approximately three months later.  Despite the reinstatement, Rowlands was never reactivated in the UPS computer system and was forced to use other supervisors' IDs to process packages on the computer.

On January 2, 2013, Rowlands was terminated for a second time for allegedly "threatening" co-workers. This occurred when, as she was exiting the UPS building after her shift ended at approximately 12:00 a.m., and from at least 10-15 feet away, Rowlands displayed a taser that she carried for protection in the dimly lit UPS parking lot. One of the individuals who complained that he was "threatened" by Rowlands was a 5'11" tall, approximately 35 year-old professional body-builder, Joe Gropengieser, who had previously been terminated for fighting, routinely tried to start fights, directed others to fight in his role as a union steward and was in direct line for Rowlands' job -- which he applied for immediately following her termination. The other individual merely stated that he saw a taser.

The only weapon expressly prohibited by UPS in its workspace is a hand gun.  Even after Rowland's termination, UPS does not by word or sign prohibit mace, pepper spray, tasers or other articles of personal protection from entering the premises with its workers. UPS affirmatively permits its employees to carry their own personal knives, razors and boxcutters, which it provides, for on-the-job use.

Defendant's motion should be denied, because there are genuine issues of material fact that preclude summary judgment as a matter of law on Rowland's claims of retaliation and discrimination on the basis of her disability/perceived disability/record of impairment, sex and age.

2

## II.      STATEMENT OF GENUINE DISPUTES

Pursuant to L.R. 56-1(b) of the Northern District of Indiana, Plaintiff's Statement of Genuine

Disputes is attached hereto and incorporated herein as Appendix A.

## III.  STANDARD OF REVIEW

Summary judgment is only appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as matter

of law." *Rasheed v. Board of Trustees of Community College District* 508, Cause No. 12 C 9382,

*6 (N.D.Ill. 8-22-2014), citing *Magin v. Monsanto Co*., 420 F.3d 679, 686 (7th Cir. 2005); See

also, Federal Rule of Civil Procedure 56(c). "Courts do not weigh the evidence or make credibility

determinations when deciding motions for summary judgment."  *Rasheed*, at *7.  "Rather, courts

view all facts and draw all reasonable inferences in the non-moving party's favor, and determine

whether there is a genuine issue of triable fact." *Id*.; See also, *Atanus v. Perry*, 520 F.3d 662, 671

(7th Cir. 2008). "Whether a fact is material depends on the underlying substantive law that governs

the dispute, and a genuine dispute is one where 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'" *Rasheed*, at *7.

## IV.     ARGUMENT

A.  Rowlands was Discriminated Against on the Basis of Her Disability/Perceived
     Disability/Record of Impairment

Because Rowlands' disability discrimination claim arises after January 1, 2009, the ADA

Amendments Act of 2008 (ADAAA), and its broadened definition of disability applies. 42

U.S.C. § 12101.  For her ADAAA disability claim, Rowlands must establish either that she has

(1) "a physical or mental impairment that substantially limits her in one or more major life

3

activities"; (2) "a record of such an impairment"; or (3) UPS regarded her "as having such an impairment." 42 U.S.C. § 12102(1); *Bodenstab v. County of Cook*, 469 F.3d 651, 656 (7th Cir. 2009). Rowlands argues both that she suffered from a physical impairment that substantially limits her in her life activities and that UPS regarded her as having an impairment. Under the ADAAA, "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(ii).

Rowland's *prima facie* ADA claim may be established by showing that "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014)(quoting *Dvorak v. Mostardi Platt Assoc., Incl.,* 289 F.3d 479, 483 (7th Cir. 2002)).

1. Rowlands Suffered from a Physical Impairment that Substantially Limited Her In One or More Major Life Activities

UPS dismisses Rowlands' disability claim with less than one page devoted to its argument because, "Rowlands had been released to work full duty without restriction at the time of both terminations at issue in this case. (citation omitted). She did not qualify as disabled." (Def. MSJ, pgs. 15-16.) Working with no restrictions does not mean that an individual is not disabled within the meaning of the ADA, however. It is undisputed that Rowlands injured her knee at work, with a severe injury occurring on April 6, 2012, which kept her off of work until

4

April 23, 2012. Rowlands returned, but was scheduled for surgery on July 27, 2012.  Rowlands was terminated the first time for alleged time card fraud on July 19, 2012 only eight days prior to her scheduled surgery, but she returned to her position on September 27, 2012 following her successful arbitration.  During the arbitration proceedings, Rowlands told Liskey that her termination was not for the time card issue, but was really because of her knee injury. (Ex. 1 at 56, 318-320.)

At the time of her return on September 27, 2012, Rowlands knee was not close to 100%, and she alternated between a large and smaller brace until the day of her second and final termination on January 2, 2013. (Ex. 39 ¶ 11.)  In her First Amended Complaint and in her affidavit, Rowlands asserted that her knee injury "interfered with her ability to walk, stand, squat and kneel," and impeded her everyday life activities of "climbing into vehicles, exercising enjoying recreation, picking up objects…" (Docket 27-3, pg. 2 ¶ II; Ex. 39 ¶¶ 11-14.)  Rowlands told Liskey that her knee hurt more after the surgery than before, and her movement was restricted by the braces that she rotated between, which held ice. Rowlands avoided the second floor of the UPS building, which housed the bathroom and break room, because the stairs were so difficult for her. She further used her break time, and other time during the day when she could, to ice and elevate her knee. Rowlands was impeded in that regard by Gropengieser, who would report her for sitting when she tried to ice her knee and Liskey, who would confront her regarding why she was sitting on the job. (Ex. 39 ¶¶ 11-19, 33.)

Liskey also knew that Rowlands was concerned about further injury to her knee when she requested that the scanner at her workstation, which had a six foot cord, be switched out to a scanner like the one Gropengieser was permitted to use, which had a 24 inch cord. She told

Liskey that it was a "hazard". (Ex. 39 ¶¶ 26-29.) Liskey also knew that Rowlands was asking for lighter duty jobs to accommodate her injury - - discussed more fully below. (Id. ¶¶ 21-23.)

For the reasons detailed above, Rowlands knee injury affects the performance of the major life activities of working, walking and standing, and is fundamentally different when compared to someone without the same injury/impairment. 29 C.F.R. § 1630(j)(1)(v). She was disabled within the meaning of the law.

      2.  Rowlands was Regarded as Disabled

Under the ADAAA, the analysis of a "regarded as" disability claim has dramatically changed as there is no requirement to establish the covered entity's beliefs concerning the severity of an impairment. 29 C.F.R. § 1630.2(1) appendix. Further, there is no reasonable accommodation entitlement for an individual covered by the "regarded as" prong. 42 U.S.C. 12201(h). The Appendix to 29 C.F.R. § 1630.2(1) gives the following example of a "regarded as" disabled employee:

> Thus, for example, an employer who terminated an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to lose consciousness, has regarded the individual as disabled.

76 F.R. 16978, at *17015 (March 25, 2011.)

Rowlands is regarded as disabled "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102.

Rowlands had been off of work for extended periods of time in 2005, 2008-2009, 2011 and now in 2012. (Ex. 1 at 40-42, 65-66, 86-88, 448-449; Ex. 2 at 54.)   There was every reason

for Liskey to believe that Rowlands' knee injury was going to continue to cause her problems, and time off of work, since after Rowlands was brought back to the job in September 2012, she came back wearing a knee brace and complained to Liskey that her knee hurt worse than before the July 2012 surgery. (Ex. 39 ¶¶ 11, 33; Docket 27-3 pg. 2 ¶ II.) Further, Rowlands was wearing the brace and icing her knee from the date of her return on September 27, 2012 until the date of her January 2, 2013 termination. (Ex. 39 ¶¶ 10.)   Rowlands asserts that she told Liskey during her arbitration proceedings that her first termination was really for her injury and not for time card fraud. (Ex. 1 at 56, 318-320.) During his deposition, Harms agreed that UPS was trying to get rid of Rowlands because of her physical condition, "She had been hurt several times." (Ex. 2 at 93.)  Harms further testified that UPS had Rowlands "under a microscope" and that they were "hawking" her movements, her work and even the time that she would use in the bathroom. (Id. at 14-15, 20, 85-86, 89.)

There is every reason that a trier of fact could infer that UPS regarded Rowlands as disabled.

### 3.  Rowlands was "Qualified"

Rowlands must establish that she was "qualified" to perform the QC Clerk position. 42 U.S.C. § 12112(a). Under the ADA, Rowlands is "qualified" if she has the skill, experience, education, and other requirements for the job and could do the job's essential functions, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

Rowlands could perform her job with or without a reasonable accommodation, and there is no evidence before this court that Rowlands was ever counseled regarding falling behind in her duties or failing to perform her QC tasks. Rowlands asserts that she did request some reasonable

accommodations such as performing the computer part of the QC job that was given to Gropengieser and having the scanner which injured her leg moved from her work area. Liskey denied each of those requests - - discussed more fully below - - and Rowlands continued to perform her duties despite the daily swelling and need to ice and elevate her leg. (Ex. 39 ¶¶ 10-13, 32.)

4.  Rowlands suffered an adverse employment action - Termination

Rowlands must show that she suffered an adverse employment action, in this case termination, because of her disability. *EEOC v. Lee's Log Cabin*, 546 F.3d 438, 442 (7th Cir. 2008), *amended by, reh'g en banc denied by,* 554 F.3d 1102 (7th Cir, 2009)(internal citation omitted.) It is undisputed that Rowlands was terminated on January 2, 2013 for allegedly "threatening" Gropengieser and others when they merely viewed her taser. But this termination does not pass the "smell test", or as Harms testified, his test of basic "common sense." (Ex. 2 at 119-120.)

5.  Pretext

Rowlands and Harms each testified to the many ways that Rowlands was singled out and given arbitrary punishments and directives in the few months leading up to her termination: having to receive permission from *two* supervisors if Rowlands wanted to leave the premises (Ex. 10); being prohibited from bringing her purse to her workstation - - described as "petty" by a supervisor who refused to administer the discipline - - when others were bringing in sports bags and coolers, and being told, "We're not going to worry about them" and "This is for you" (Ex. 1 at 25-26, 28-29, 56, 117-119, 186-187, 263-265, 267); having parts of her job given to Gropengieser, a substantially younger male, which meant she was sent home early (Id. at 287-292); refusing

Rowlands' request to be trained to drive a forklift (Id. at 298); refusing to permit Rowlands to take breaks with her coworkers (Id. at 185, 194); refusing to train Rowlands on the computer data entry of packages that Gropengieser performed in the QC area. (Id. at 349); refusing to permit Rowlands to attend safety meetings for her QC department and giving the duty to Gropengieser, a less senior combo worker (Id. at 120-121, 174-175, 438-439); refusing to permit Rowlands to move her car closer to the building during break time, which Harms even argued to Liskey was unsafe (Id. at 20-21, 26-27, 45, 148-151; Ex. 2 at 45-46, 55-59, 112-113); writing Rowlands up on her first day back on the job on September 27, 2012 for failing to "record all meals and breaks properly…" (Ex. 1 at 123; Ex. 13); and, writing Rowlands up on her second day back on the job on September 28, 2012 for leaving without permission, which she denied. (Ex. 1 at 184; Ex. 14.) Rowlands was not surprised at the write-ups immediately following her September 27, 2012 return, because her tracking number/ID was never reinstated up to the time of her January 2, 2013 termination, and she claimed that UPS needed more documents to build a case against her. (Ex. 1 at 123, 439-440, 442-443; Ex. 13.)

UPS argues that it had every right to rely on Gropengieser's statement, "even if the steward's account of events was not accurate it is irrelevant to a determination of whether or not UPS acted in a discriminatory manner." (Def. Mem. Pg. 21) *See Coleman v. Donahoe,* 667 F.3d 835, 852 (7th Cir. 2012)(holding that the pretext question does not depend on "whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge.") Rowlands asserts that it is impossible for UPS to claim it relied on an "honest belief" in its dealings with her.

Harms asserted that Rowlands second and final termination for "threatening" the

9

younger, body builder Gropengieser with a taser was "truly, truly laughable", "truly ironic…on many levels" and "just so obviously ridiculous." (Ex. 31; Ex. 2 at 47-49, 67-78, 78-79, 95-96.) Menefee agrees, citing Gropengieser's size and his attempts to be intimidating – a bully - and calls it "comic relief". (Ex. 41 ¶¶ 13-15.) Menefee, who worked with both Rowlands and Gropengieser, further asserts that Gropengieser's statement is "an outright lie. No UPS manager could have taken any statement written by Joe Gropengieser claiming to be threatened by Linda Rowlands with a straight face."  (Id. ¶ 14.)  Harms view, which he asserts only requires common sense, is that it is *impossible* for a large man, a competing body builder, standing 10-15 feet away from a small woman with bad knees who is not coming toward him, but is actually *walking away from him and out the door*, to be threatened. (Ex. 2 at 78-79, 95-96; Ex. 39 ¶ 37 & attachment.) Further, Gropengieser had a history of fighting both on and off the UPS property and stood to gain from Rowlands' termination - - which he tried to do when he bid on her job. (Ex. 2 at 67-70, 73-74.) Harms testified that he and Gropengieser had a heated verbal altercation in Liskey's office when Harms confronted Gropengieser about writing the statement – which Gropengieser denied – and the manner that Gropengieser was displaying when he walked around the UPS facility lamenting Rowlands' termination.  (Id. at 83-84, 111.) The conversation was so heated that Gropengieser threatened to beat Harms up and Liskey told both of them that he would take them out of service if they did not stop. (Id.)

Harms is equally skeptical of the written statement given by Hurse, since Hurse did not give it to Harms, his union steward, but to a security guard. (Id. at 75-77, 114-115.) Further, Hurse's statement does not even allege that he was near to Rowlands or threatened.  It merely states that he saw her with a taser *more than a week before*. (Ex. 40 pg. 2.) Not to be undone, the

"anonymous" call placed to the UPS hotline on December 27, 2012 also states that the caller saw Rowlands "zap" a taser on December 14. (Id. pg. 4.)  The write up of the call does not state why the caller *waited nearly two (2) weeks* to make the report. (Id.)

UPS offers no explanation, because it will never be able to, for the incredible fact that no individual ever reported Rowlands and her taser before her knee injuries, although Rowlands asserts she carried it to work with her for 15 or 16 years and would remove it from her pocket *every night* as she walked out the door after midnight and into the UPS parking lot.  (Ex. 1 at 19-21, 119-120, 144-147, 333-335; Ex. 18; Ex. 41 ¶ 19.) Menefee is also "surprised" that UPS is complaining about Rowlands' taser, as Rowlands carried it for years and made no secret of carrying it.  (Ex. 41 ¶ 19.) Further, UPS only affirmatively prohibits handguns from the premises - -  not small knives, LARGE knives carried openly in sheaths, boxcutters, which UPS provides, tasers, mace or pepper spray.  (Ex. 2 at 59, 62; Ex. 41 ¶¶ 5, 11; Ex. 42.) Harms testified that he has never seen any directive or sign posted by UPS prohibiting tasers or any other self-protection devices on the premises, and according to Harms, "..[T]he boxcutter is way more dangerous.". (Ex. 2 at 58-59, 119-121.) Menefee asserts UPS conveyed by word and sign that "weapon" meant handguns. (Ex. 41 ¶ 9.) Further, Menefee asserts that she openly wore a can of mace, which her manager knew of, another form of non-lethal personal protection. (Ex. 41 ¶ 5.)

UPS raises the case of *Dunn v. Nordstrom, Inc.,* 260 F.3d 778 (7th Cir. 2001) in support of its proposition that UPS did not administer its weapons policy in a discriminatory manner, but Rowlands begs to differ.  (Def. Mem. Pg. 19.) In *Dunn*, the plaintiff alleged that his termination for violating Nordstrom's weapon policy was pretextual and that he was really terminated on the grounds of race. *Id* at 782. The Seventh Circuit Court of Appeals found that even if Nordstrom

did not enforce its weapons policy until the plaintiff's termination, the plaintiff could not show

that when Nordstrom did choose to enforce it, it did so in a discriminatory manner. *Id.* at 788.

But Rowlands' case is different; UPS *does* enforce its weapons policy in a discriminatory

manner.

　　　UPS asserts through the affidavit of Liskey that "pocket knives" are permitted for work

use. (Def. Mem. Ex. 4  ¶ 29.) Harms and Menefee allege that the men of UPS are permitted to

walk around carrying or wearing "substantial" knives, "large buck knives" that "by no stretch of

the imagination could they be considered "pocket knives"…those knives [are] lethal." (Ex. 2 at

59, 62; Ex. 41 ¶ 11.)  Further, in contrast to *Dunn,* which only had a written policy prohibiting

weapons, UPS affirmatively displays a "no handgun" sign. (Ex. 42.) Menefee asserts that UPS

conveyed by word *and sign* that by "weapon" UPS meant handguns. (Ex. 41 ¶ 9; Ex. 42.)

Menefee states, "I had no reason to believe that a taser violated the UPS weapons policy, as the

definition of a "weapon" was never given in writing or through any union and/or other meetings

that I attended." (Ex. 41 ¶ 10.)  Harms also asserts that to this day UPS has given no directives to

its union members that tasers are verboten. (Ex. 2 at 59, 112.) When questioning Harms, counsel

for UPS even referred to tasers as "non-lethal personal protection," which a trier of fact could

infer would be confusing for a UPS worker if he/she was trying to decide between "weapon"

versus a non-lethal item of "personal protection." (Ex. 2 at 59.)  By giving UPS expansive

leeway in the definition of "weapon," Rowlands could theoretically have been terminated for

holding up a sharp, pointed metal fingernail file. Finally, Menefee asserts that she openly wore a

large can of mace, which her supervisor was aware of.  (Ex. 41 ¶ 5.)  Menefee, Harms and

Rowlands all assert that others carried mace/pepper spray, as well. (Id. ¶ 12; Ex. 1 at 72; Ex. 2 at

60.) While none of them can swear that a member of management knew that UPS workers carried mace/pepper spray (other than Menefee and her manager), Menefee said that the spray was visible "to anyone with eyes." (Ex. 41 ¶ 12.)  Further, the UPS weapons policy is applicable to all individuals working at the center, QC Clerks, drivers, combo workers and those who work washing trucks, etc.

The court should not permit UPS to hide behind *Dunn* when it permits its male employees to carry "*lethal"* large buck knives, and others to carry non-lethal personal protection: mace/pepper spray or a taser. Rowlands is correct when she asserts that UPS created her need for a taser as a manner of "self-protection" by forcing her to park in a dangerous lot, far from the building when Harms even argued with Liskey that it was dangerous for her to be out there alone in the middle of the night.  (Ex. 2 at 56-57; Ex. 1 at 20-21.) Further, UPS makes no attempt to address the fact that Rowlands asserts that she carried a taser *every day* for 15 or 16 years, which testimony is supported by Menefee, who finds it "[surprising] that UPS is only complaining about it now." (Ex. 1 at 19, 144-147; Ex. 41 ¶ 19.) UPS has made no attempt to administer its "policy", which is confusing at best, in an even-handed manner as the employer in *Dunn* attempted to do.  *Dunn,* 260 F.3d at 788; *See also Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 290 (7th Cir. 1999)(questioning the sincere application of the store's theft policy and finding that it does not "pass the straight-face test").

The court must also note that Rowlands was terminated for "threatening" Gropengieser, an alleged violation of its Workplace Violence Prevention Policy. (Ex. 21.) UPS, however, makes no mention of Gropengieser's threat to beat Harms when Harms questioned Gropengieser's behavior - - lamenting Rowlands' termination to coworkers without telling them that he had written the

13

complaint used against her. (Ex. 2 at 83 -84.) Further, that threat occurred in the presence of UPS management, Liskey, who threatened to take Harms and Gropengieser out of service if they did not end their argument. If Rowlands merited dismissal for violation of the policy, surely Gropengieser merits the identical treatment to prove that UPS follows its "zero tolerance" violence prevention policy in a non-discriminatory manner. (Ex. 21.)

Because there is every reason to find Rowlands' termination for "threatening" Gropengieser and the "others" to be mendacious, a trier of fact could reasonably infer that the real reason behind Rowlands' termination is the reason given by both Rowlands and Harms, "She had been hurt several times." (Ex. 2 at 93.)  Further, when Harms attempted to get Liskey to reconsider the termination, because there was no justification and no documentation in the building regarding tasers, Liskey told him, "…[S]he has been a constant pain in my butt…and…management has been on me continually about this." (Id. at 97-98.) There is no evidence that Rowlands was ever  disciplined for her work product, so a reasonable inference may be drawn by a trier of fact that UPS management had been on Liskey to get rid of Rowlands because she had suffered a severe injury, which was costing the company in lost time and benefits.

B.  Rowlands' Failure to Accommodate Claim

UPS deposed Rowlands on two separate occasions, yet did not ask any questions regarding her claim that UPS failed to engage in the interactive process to determine a reasonable accommodation for her workplace injury, which was plead in her EEOC Charge of Discrimination, attached and incorporated into her Complaint.[2] (Docket 27-3, pg. 3.)  Further,

---

2 Fed. R. Civ. P. 10(c), Adoption by Reference; Exhibits; *See also, Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998).

14

UPS has failed to file for summary judgment regarding this claim, waiving the argument.

This court must determine whether UPS made reasonable accommodations to Rowlands after she notified them of her condition. The accommodation process begins when the employee notifies the employer of her disability; "at that point, an employer's liability is triggered for failure to provide accommodations." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014)(quoting *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 805 (7th Cir. 2005)(quoting *Gile v. United Airlines, Inc.,* 213 F.3d 365, 373 (7th Cir. 2000))); *See Hedburg v. Indiana Bell Tel. Co., Inc.,*, 47 F.3d 928, 934 (7th Cir. 1995)(reasoning that "if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer.")

For Rowlands' failure to accommodate claim, she must establish that: (1) she is a qualified individual with a disability; (2) UPS knew of her disability; and (3) UPS failed to reasonably accommodate Rowlands' disability. *Feldman v. Am. EM'L Life Ins. Co.,* 196 F.3d 783, 789 (7th Cir. 1999). Rowlands is a qualified individual with a disability (see argument, above) and UPS knew of Rowlands' disability. (Ex. 39 ¶¶  10-33.) UPS not only failed to engage in the interactive process with Rowlands, it actively harassed her and put up obstacles to her attempts to work productively. As noted, Rowlands, wearing a knee brace from the date that she returned from her knee surgery on September 27, 2012 through the date of her second termination on January 2, 2013, was not permitted to go to her car on her breaks or be outside, so she was forced to try to ice and elevate her knee during her breaks on the loading dock.  (Ex. 39 ¶¶ 16-17.) Rowlands asserts that it was difficult to do so given the position that she was forced to sit in. (Id.)

15

Rowlands asked two different supervisors, Jones and Liskey, on two different occasions, if she could use the downstairs bathroom, because the stairs were difficult for her to climb.  She was refused each time.  Jones claimed that she did not have a key, which she made no attempt to obtain, and Liskey told Rowlands that the bathroom was for management personnel. (Id. ¶¶ 4, 15.)

When Rowlands, who performed many of her duties while standing, attempted to ice her knee during her shift, Gropengieser would report her for sitting to Liskey, who would then confront Rowlands. (Id. ¶¶ 18-19.)  Further, when Rowlands asked to perform the part of her QC duties which would permit her to sit, computer entry of packages and answering the phone, Liskey refused "with no discussion" and continued to permit Gropengieser to perform them.  (Id. ¶¶ 21-23.) Liskey also refused to make Gropengieser assist Rowlands when she had difficulty lifting a package and moving damaged packages which were piling up. (Id. ¶¶ 24-25.) Rowlands told Liskey that the scanner she used was a hazard and worried about further injury to her knee, as she had previously tripped on the extra-long cord, which would wrap around her chair and desk drawers. Liskey, however, failed to change the scanner used by Rowlands, which had a six foot long cord, to a scanner like the one used by Gropengieser, which had an 18 inch cord.  (Id. ¶¶ 26-31.)

Rowlands handled her part of the equation when she informed Liskey that she needed an accommodation to permit her to work well; UPS did not drop the ball, it never even picked it up. For the foregoing reasons, this court should find against UPS on Rowlands' claim of failure to engage in the interactive process to find a reasonable accommodation and permit Rowlands to proceed to trial with that claim.

16

C.  Rowlands ADA Retaliation Claim and Retaliation Based on Protected Activity

For Rowlands to prove her retaliation claims, she must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal link between the two. *Bernuzzi v. Bd. of Educ. Of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

i.       Rowlands ADA Retaliation Claim

Rowlands did request reasonable accommodations for her knee impairment, protected activity, and she was terminated, an adverse action.  The question is whether a trier of fact could infer a causal link between the two.  Because Rowlands has no direct admissions of retaliatory motive, she must "present a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work." *Smith v. Bray*, 681 F.3d 888, 901 (7th Cir. 2012).  The mosaic generally falls into three (3) categories, and Rowlands will concentrate on the third: "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.*

Because Rowlands has argued the pretextual nature of the accusations against her by Gropengieser, Hurse and "Anonymous", which have problems with sheer believability and timing, respectively, she will not set forth that evidence again, but incorporates it by reference. (See Disability Section, #5 - Pretext Argument.) Rowlands' and Harms' testimony that she was terminated on the basis of her injury/disability are credible, and a reasonable trier of fact could infer that Rowlands was retaliated against and terminated on the basis of her disability when she came back to work in a brace and needed to ice and elevate her leg on a nearly daily basis.  For

those reasons, the court should find that Rowlands retaliation claim on the basis of her disability should not be dismissed on summary judgment.

      ii.      Rowlands Retaliation Claim Based on Protected Activity

Rowlands will agree that she has no proof that Liskey was aware of her EEOC filings even though they show a "temporal proximity" to her termination – one month between the issue of the Notice of Right to Sue letter on December 2, 2012 and her termination on January 2, 2013 - and will agree to dismiss that claim, only, with prejudice.  *Leitgen v. Franciscan Skemp Healthcare, Inc.,* 630 F.3d 668, 675 (7th Cir. 2011).

    D.   <u>Rowlands was Discriminated Against on the Basis of Her Gender and Age[3]</u>

Rowlands gender discrimination claim under Title VII of the Civil Rights Act of 1964 or her claim of age discrimination pursuant to the ADEA may be proven utilizing either the "direct" or "indirect method." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 876 (7th Cir. 2014); *Andrews v. CBOCS W, Inc.* 743 F.3d 230, 234 (7th Cir. 2014).  The Seventh Circuit Court of Appeals has found that "when all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Ripberger*, 773 F.3d at 876 (quoting *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014)).

Rowlands disagrees with UPS that she is unable to proceed under the direct method, as she has a rather large amount of evidence, which taken together would create a convincing mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination by the decision maker. *Rogers v. City of Chicago*, 320 F.3d, 748, 753 (7th Cir. 2003); *Troupe v. May Dep't Stores Co*., 20 F. 3d 734, 737 (7th Cir. 1994).  "The relevant

---

3 Rowlands only plead age and gender discrimination as part of the basis for her first termination for alleged time card fraud.  She did not plead age and gender discrimination regarding her second termination for the taser incident.

circumstantial evidence in discrimination cases ordinarily consists of indicators showing what may be 'the real motivating force for employment decisions.'" *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010)(quoting, *Coffman v. Indianapolis Fire Dep't,* 578 F.3d 559, 563 (7th Cir. 2009). Circumstantial evidence, unlike direct evidence, need not directly demonstrate discriminatory intent, but rather it "allows a jury to infer intentional discrimination by the decision maker" from suspicious words or actions.  See *Rogers*, 320 F.3d at 753."

UPS has argued the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)(citations omitted), but that scarcely works for Rowlands' case as she was the only full-time QC Clerk. Pursuant to *Coleman v. Donahoe,* 667 F.3d 835, 841(7th Cir. 2012), however, Rowlands must only show "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* (quoting *Humphries v. CBOCS West, Inc.,* 474 F.3d 287, 405 (7th Cir. 2008) *aff'd* 553 U.S. 442 (2008)(citations omitted)). Her nearest comparable is Gropengieser, a substantially younger male[4], who performed many duties in the QC department with Rowlands.  For purposes of age discrimination, "substantially younger" is generally defined as ten years younger. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1118 (7th Cir. 2009); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321-22 (7th Cir. 2003).

In addition to her other proof, for her age claim, Rowlands must demonstrate that her age "was a but-for cause of [her] termination." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th

---

4 Rowlands was 50 and Gropengieser was 37.

Cir. 2012); *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009)(citations omitted).  Rowlands

may rely on circumstantial evidence of age discrimination sufficient to permit a trier of fact to

conclude that unlawful discrimination motivated UPS to terminate her employment. *Ripberger,*

773 F.3d at 877.  Discriminatory intent via circumstantial evidence may include: suspicious

timing, ambiguous statements, evidence that others outside the protected class were

systematically treated better, or evidence that the employer gave a pretextual reason for the

adverse employment action.  *Id.*

UPS concedes that Rowlands is a female over the age of forty, but argues that she has no

evidence of any similarly situated individuals who were treated more favorably than she.

Rowlands asserts that she has many examples of individuals who were treated more favorably,

and that the court must look to the reasons for her first termination for alleged time card fraud as

pretextual.

     i.     <u>Rowlands First Termination for Alleged Time Card Fraud</u>

Rowlands asserts that her first termination for time card fraud was a sham to cover up

Liskey's real reason for her termination: the fact that she was a 50 year-old woman suffering a

severe workplace injury, which necessitated surgery. (Ex. 1 at 56, 318-320.)  According to Harms,

others, including himself, used the time card system in the same manner as Rowlands. (Ex. 1 at

271-272; Ex. 2 at 86-87.) Rowlands testified that she was never trained on the new system when

she returned from her hip replacement in 2008/2009, which means that she was using it incorrectly

for approximately three years before UPS put her "under a microscope" and were "hawking"

Rowlands to find something to charge her with. (Ex. 1 at 44-45; Ex. 2 at 14-15, 20, 85-86, 89.)

Rowlands also asserts that Heather Jones ("Jones") a part-time supervisor, would change the start

times for the male employees. (Ex. 1 at 270; Docket 27-1 pg. 2.) According to Harms, the computer/clocking mechanism was finally changed after Rowlands was brought back to prevent everyone from having the capability to change their time. (Ex. 2 at 86-88.)

UPS argues that it has terminated two younger male employees without any known disability for similar time entry violations. (Def. Mem. pg. 17; Def. Ex. 6, Johnson Aff. ¶9.) One of those men was terminated in August 2014 and the other in April 2015, long after Rowlands' termination and reinstatement so their value is negligible; they could be considered merely post-remedial measures. Further, their terminations would have occurred after the computer/clocking mechanism had been changed to prevent employees from changing their time. What is not negligible is the fact that Gropengieser, a substantially younger male, was doing much of Rowlands' QC Clerk job prior to her termination for time card fraud, and after she returned, and he was given Rowlands' position on the safety committee even though he was not in the QC Department. Despite Rowlands' many requests, both before and after her severe knee injury, she was never permitted to learn the computer entry part of the QC job that Gropengieser was permitted to do. (Ex. 39 ¶ 22.) Further, while it may seem petty, Rowlands was prohibited from bringing her purse into the workspace, but the men were permitted to bring their gym bags and coolers. Finally, Rowlands asserts that several of her male coworkers conducted business from their vehicles and were permitted to go to them at any time of the day; Rowlands was prohibited from going to her car to move it during break, even though she needed to do it for safety reasons.

Harms testified regarding the age animus at UPS and the drivers who felt they were given heavier workloads, because of their age. (Ex. 2 at 98-99.) According to Harms,  he could have filed an age discrimination lawsuit when the position he bid for was given to a substantially younger

man with less seniority. (Id. at 104-105.) Harms did not follow through due to the hassle. (Id. at 100-101.)

Based on the foregoing evidence, Rowlands asserts that she was discriminated against on the basis of her sex and age and that the reason for her first termination, time card fraud, was a pretext that ultimately failed to deprive her of her position when she was reinstated after arbitration. Further, a reasonable trier of fact could view the evidence and determine that but-for Rowlands' age and gender, she might be working at UPS today.

## CONCLUSION

There are genuine issues of material fact as to Defendant's proffered reasons for Rowlands' terminations for alleged time card fraud and for violation of the UPS weapons policy thereby precluding dismissal of Rowlands' claims as a matter of law. Defendant's motion for summary judgment should be DENIED.

WHEREFORE, Plaintiff respectfully requests that the Court DENY Defendant's motion for summary judgment and grant Plaintiff all other just and proper relief in the premises.

Respectfully submitted,

**CHRISTOPHER C. MYERS & ASSOCIATES**

/s/ Lori W. Jansen
Lori W. Jansen, # 19417-57
809 South Calhoun Street, Suite 400
Fort Wayne, Indiana 46802
Telephone:    260-424-0600
Facsimile:    260-424-0712
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby swears and affirms that a true and correct copy of the above was deposited in the United States Mail, sent via ECF, or served by some other method approved by this Court, on this 3rd day of February 2016, addressed to:

Jeffrey S. Piell
Brian J. Hartstein
John A. Klages
Quarles & Brady LLP
300 North LaSalle Street, Ste. 4000
Chicago, IL 60654


/s/ Lori W. Jansen
Lori W. Jansen